```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA

    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
UNITED STATES OF AMERICA,          )  Criminal Action
                                   )  No. 19-MJ-100
vs.                                )
                                   )  April 23, 2019
PETER BELER,                       )  3:02 p.m.
                  Defendant.       )  Washington, D.C.
                                   )
    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE DEBORAH A. ROBINSON,**
**UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**

<u>**APPEARANCES**</u>:

```
FOR THE GOVERNMENT: NICHOLAS G. MIRANDA
                    U.S. Attorney's Office
                    For the District of Columbia
                    555 Fourth Street, NW
                    Washington, DC 20530
                    (202) 252-7011
                    Email: Nicholas.Miranda@usdoj.gov


FOR THE DEFENDANT:  EMILY A. VOSHELL
                    Kaiser Dillon PLLC
                    1099 14th Street, N.W.
                    8th Floor West
                    Washington, DC 20005
                    202-640-2850
                    Email: Evoshell@kaiserdillon.com


 ALSO PRESENT:      CHRISTINE SCHUCK, Pretrial Services
```

**Proceedings recorded by FTR Gold Electronic Recording Software.**
**Transcribed by stenographer via machine shorthand.**
**Transcript produced by computer-aided transcription.**

```
 Transcriber:       Elizabeth Saint-Loth, RPR, FCRR
                    Official Court Reporter
                    Washington, D.C.  20001
```

**P R O C E E D I N G S**

1          THE DEPUTY:  Magistrate Case No. 2019-100M.

The United States of America versus Peter Beler.

          Nicholas Miranda representing the Government;

Emily Voshell representing the defendant.  The defendant is

present in the courtroom.

          Your Honor, is this just the preliminary hearing

today?

          THE COURT:  I believe we should indicate that this

is a preliminary hearing only.

          Thank you very much.

          THE DEPUTY:  Thank you.

          This case is being called for a preliminary

hearing.

          THE COURT:  Counsel, I thank you for being patient

during the delay in reaching your matter.

          The Court called this matter yesterday.  The basis

of the order that the Court expects to enter providing for

an evaluation need not be revisited today; we discussed that

yesterday.

          The purpose of the continuance was to give you an

opportunity to consider whether the decision to which I

directed your attention requires that the Court make a

finding with respect to probable cause prior to such

evaluation.  The Court is of the view that it does; however,

1    I wanted you to have an opportunity to review the opinion

2    and address the question directly.

3            Do you wish to begin, Miss Voshell?

4            MS. VOSHELL:  Sure, Your Honor.

5            THE COURT:  Thank you, Miss Voshell.

6            MS. VOSHELL:  Yes, Your Honor.  Thank you.

7            I have had an opportunity to review the decision,

8    *United States versus Crawford.*  I think, out of an abundance

9    of caution, Your Honor, we are prepared to go forward with

10   the preliminary hearing today in light of that case.

11           THE COURT:  Very well.  Thank you very much.

12           And you are also prepared to do so, Mr. Miranda?

13           MR. MIRANDA:  Yes, Your Honor.

14           THE COURT:  Very well.

15           Is your witness in the courtroom?

16           MR. MIRANDA:  Yes, she is.

17           Your Honor, at this time the Government would call

18   Agent Tanya Griffith.

19           THE COURT:  Good afternoon, Agent.

20           Please, step up and face the deputy clerk to be

21   sworn.

22           (Whereupon, the witness was sworn.)

23           THE WITNESS:  I do.

24           THE DEPUTY:  Thank you.  You may be seated.

25           THE WITNESS:  Thank you.

1          THE COURT:  Thank you very much.

2          Good afternoon.

3          THE WITNESS:  Good afternoon, Your Honor.

4          MR. MIRANDA:  Agent Griffith --

5          THE COURT:  Mr. Miranda, please proceed.

6          MR. MIRANDA:  Thank you, Your Honor.

7                    DIRECT EXAMINATION

8    BY MR. MIRANDA:

9    Q.  Agent Griffith, could you please state and spell your

10   name.

11   A.  It's Tonya, T-O-N-Y-A, Griffith, G-R-I-F-F-I-T-H.

12   Q.  And, Agent Griffith, how are you employed?

13   A.  I am a special agent with the FBI.

14   Q.  How long have you been with the FBI?

15   A.  Since February of 2002, so a little over 17 years.

16   Q.  And I know you just said this, but what's your current

17   rank?

18   A.  I am a special agent.

19   Q.  And as a special agent, is there a particular type of

20   crime or investigation that you focus on?

21   A.  Yes.  Right now I am assigned to the child exploitation

22   task force.  So I investigate, primarily, online traders of

23   child pornography and online exploitation of children.

24   Q.  And in the course of your role at the child exploitation

25   task force, did you have the opportunity to investigate a

1    case involving Peter Beler?

2    A.  Yes.

3    Q.  And in conjunction with that case, did you draft a

4    criminal complaint and Statement of Facts as a probable

5    cause document with regard to that case and that defendant?

6    A.  Yes.

7            MR. MIRANDA:  With the Court's permission, I'd

8    like to approach the witness and present to the witness what

9    I will mark as Government's Exhibit 1.

10            THE COURT:  You may.

11            MR. MIRANDA:  Thank you.

12    BY MR. MIRANDA:

13    Q.  I am now showing you what I have marked as Government's

14    Exhibit 1.  If you could, just take a look at that document

15    and look up when you have had an opportunity to review it.

16            And, Agent Griffith, do you recognize that

17    document?

18    A.  I do.

19    Q.  What is that document?

20    A.  It's the criminal complaint that was filed in this case

21    with an affidavit of Statement of Facts.

22    Q.  And was that Statement of Facts drafted by yourself?

23    A.  With the assistance of counsel, yes, it was.

24    Q.  And is all of the information in that Statement of Facts

25    true and accurate to the best of your knowledge and

1    information?

2    A.  Yes, it is.

3    Q.  Is there anything in that Statement of Facts that you

4    believe based on your knowledge and information and

5    investigation that is either untrue or incomplete?

6    A.  No.

7            MR. MIRANDA:  For the record, Your Honor, a copy

8    of this document has been previously provided to defense

9    counsel.

10           Your Honor, with the Court's permission --

11   BY MR. MIRANDA:

12   Q.  First, let me ask.

13           If permitted by the Court to do so today, would

14   you adopt the Statement of Facts as part of your sworn

15   testimony?

16   A.  Yes, I would.

17           MR. MIRANDA:  Your Honor, with the Court's

18   permission, we would ask that the witness be allowed to

19   adopt the Statement of Facts supporting the criminal

20   complaint as part of her sworn testimony here today.

21           THE COURT:  Is that without objection,

22   Miss Voshell?

23           MS. VOSHELL:  Yes, Your Honor.  That's without

24   objection.

25           THE COURT:  Thank you very much, Miss Voshell.

1          The Court will permit special Agent Griffith to

2     adopt the Statement of Facts as a portion of her testimony

3     without objection.

4          MR. MIRANDA:  Thank you, Your Honor.

5     BY MR. MIRANDA:

6     Q.  Now, in the Statement of Facts, you refer to someone

7     alternatively as Peter Beler or "Beler"?

8     A.  Yes.

9     Q.  Do you see that person in the courtroom here today?

10    A.  I do.

11    Q.  Can you please identify him by an article of clothing

12    that he is wearing and where he is seated?

13    A.  He is seated at the side of the defense attorney wearing

14    a yellow shirt -- I'm sorry -- an orange shirt with glasses.

15          MR. MIRANDA:  May the record reflect an in-court

16    identification of the defendant?

17          THE COURT:  Miss Voshell, is the in-court

18    identification without objection?

19          MS. VOSHELL:  Yes, Your Honor.

20          THE COURT:  Thank you, Miss Voshell.

21          The record will reflect the in-court

22    identification.

23          MR. MIRANDA:  Thank you.

24          At this time, the Government has no further

25    questions.

1          THE COURT:  Thank you very much, Mr. Miranda.

2          Miss Voshell, you may cross-examine.

3          MS. VOSHELL:  Thank you, Your Honor.

4                      CROSS-EXAMINATION

5    BY MS. VOSHELL:

6    Q.  Good afternoon, Agent Griffith.

7    A.  Good afternoon.

8    Q.  I have a few follow-up questions based on your Statement

9    of Facts.

10          So you went to Mr. Beler's apartment on

11   April 17th, 2019, correct?

12   A.  Correct.

13   Q.  All right.  And your purpose in going to Mr. Beler's

14   apartment was to execute a search warrant?

15   A.  Yes.

16   Q.  Okay.  At the time that you arrived at Mr. Beler's

17   apartment, did you have any intent to effect an arrest?

18   A.  No.

19   Q.  When you approached the door -- were you with the

20   initial team who approached the door of the apartment?

21   A.  Yes.

22   Q.  Okay.  All right.  Who else was with you at that time?

23   A.  I can't remember the number off the top of my head, but

24   there were several officers -- excuse me -- several other

25   agents and task force officers there.

1    Q.  All right.  How did you announce yourselves?

2    A.  We knocked on the door and indicated we had a search

3    warrant, and it was the police.

4    Q.  Okay.  And about how much time past between when you

5    knocked and when Mr. Beler entered?  I mean --

6    A.  Mr. Beler came to the door right away.

7    Q.  Okay.  And this was about 6-something in the morning; is

8    that right?

9    A.  I believe it was around 6:20, 6:25.  Sorry.

10   Q.  Okay.  And did Mr. Beler seem like he had just been

11   asleep or did he seem like he was awake?

12   A.  He seemed like he was awake.

13   Q.  All right.  And you started recording your interactions

14   with Mr. Beler at some point, correct?

15   A.  That's correct.

16   Q.  About how much time past between when Mr. Beler opened

17   the door and when you began recording your interactions with

18   him?

19   A.  It was probably five to ten minutes at most.  Enough

20   time to allow the team to clear the apartment and find a

21   place for him to sit down inside.

22   Q.  Okay.  So by the time that you began recording your

23   interactions with him, he had already been moved out of the

24   apartment and then back into the apartment?

25   A.  Yes.

1    Q.  And was anyone else present with you when you began

2    recording your interactions with Mr. Beler?

3    A.  Yes.  There was another agent with me.

4    Q.  All right.  What was that agent's name?

5    A.  Ed Michela [sic].

6    Q.  Okay.  And what conversation did you have with Mr. Beler

7    before you began recording your interactions with him?

8    A.  Before the recording it was basically just outside.  We

9    just informed him that we had a search warrant, that he

10   wasn't under arrest; and that we would try to explain

11   everything to him in a more private setting.  But we did

12   inform him that we had a search warrant.

13   Q.  Was anyone waiting with Mr. Beler when he was waiting

14   outside of the apartment?

15   A.  Yes.

16   Q.  Who was waiting with him outside?

17   A.  It was myself and, I believe, Agent Michela was with --

18   were the two people that were out there for the most part.

19   Q.  Other than that initial conversation about there being a

20   warrant and that you need to clear the apartment, was there

21   anything else that you-all said to each other during that

22   period of time before you began recording?

23   A.  We asked a few officer safety questions, just if there

24   was anyone else in the apartment, any weapons.  And then I

25   went in to do a search based on -- a visual inspection based

1  on what someone told me they found on the TV.

2  Q.  Okay.  And other than that, was there any other

3  conversation that you had with Mr. Beler before you began

4  recording?

5  A.  Not significant.  It was mostly just that we had a

6  search warrant, and that we would get him back inside just

7  as soon as we could.

8  Q.  Okay.  And what did someone come to you and say that

9  they had found on the TV?

10  A.  That they had seen file names that were up on the TV

11  that were available to see.

12  Q.  Okay.  And did you view those file names yourself?

13  A.  I did.

14  Q.  Okay.  When you viewed your [sic] file names did you

15  have an understanding from the other officers whether or not

16  they had clicked through any programs or anything like that,

17  or whether or not the file names were just up on the

18  computer itself?

19  A.  They indicated that they were up when they walked into

20  the apartment.

21  Q.  Okay.  And the -- to be clear, what was up on the

22  computer when you walked in weren't actual images; they were

23  just the names of files, correct?

24  A.  That's correct.

25  Q.  All right.  What was the general state of the apartment

1    itself?

2    A.  It was -- it was messy.

3    Q.  Did you observe any holes in the walls of the apartment?

4    A.  I didn't personally see them, but I was told that

5    someone else saw them.

6    Q.  And did you observe trash and clutter throughout the

7    apartment?

8    A.  Yes.

9    Q.  And did you observe a toilet that hadn't been flushed in

10   some time?

11   A.  Yes.

12   Q.  Did you observe food laying out?

13   A.  Yes.

14   Q.  Okay.  And so going back quickly to the television -- so

15   you write in your complaint that the computer was running a

16   torrent program and the file names being downloaded and/or

17   uploaded were clearly visible on the television screen to

18   law enforcement.

19         Were there any other windows open along with the

20   windows that indicated the particular files were being run

21   through a torrent program?

22   A.  There were some other windows open, yes.

23   Q.  And did those windows have anything to do with the

24   reason that you were there for the execution of the warrant?

25   A.  No.

1    Q.   Okay.  Do you remember what was on any of those windows?

2    A.   The one that was up, it had -- was almost like a program

3    file, different files that were located on the computer;

4    different programs that had nothing to do with why we were

5    there.

6    Q.   Okay.  How could you tell that files were downloading

7    from your observations of the screen?

8    A.   The way that the program runs, it has like a little bar

9    that will tell you that it's in process.

10   Q.   Okay.  And how could you tell that files were uploading?

11   A.   Again, it shows that there -- it gives two little bars

12   that show they're uploading and downloading.

13   Q.   Okay.  And were those all on the same screen?

14   A.   They were underneath the screen that was up.  So

15   initially we could only see the names, and the other screen

16   was up.  And then, eventually, that was minimized to show

17   the other screens.

18   Q.   All right.  Who minimized that screen?

19   A.   The forensic examiner.

20   Q.   Okay.  Who was the forensic examiner?

21   A.   John Marsh.

22   Q.   All right.  Was there anything about your interactions

23   with Mr. Beler that made you think that he might have any

24   medical issues?

25   A.   He mentioned that he wasn't feeling well, but nothing

1    physical that led us to believe that he was ill.

2    Q.  Okay.  And was there anything about your interactions

3    with Mr. Beler that made you think that he might have any

4    mental health issues?

5    A.  No.

6    Q.  Did Mr. Beler repeatedly ask you the same questions over

7    and over again?

8    A.  He wasn't very focused.  When we would ask him a

9    question, he would try and keep going back to the same

10   topic; but he understood the questions that we were asking

11   him.

12   Q.  How could you tell that?

13   A.  Eventually, when we could focus him to answer the

14   question that we were discussing, he was able to answer it

15   very accurately and was appropriate for the question that we

16   were asking.

17   Q.  All right.  Mr. Beler repeatedly told you that he didn't

18   leave his apartment, correct?

19   A.  That's correct.

20   Q.  All right.  And Mr. Beler told you that he had been

21   hospitalized for a broken hand, right?

22   A.  Yes.

23   Q.  Did Mr. Beler ever tell you that he had actually been

24   FD12'd [sic]?

25   A.  No.

1    Q.  Did you ever obtain any of the records related to

2    Mr. Beler's hospitalization yourself?

3    A.  I have not.

4    Q.  All right.  You write in your Statement of Facts that an

5    undercover employee, in March of 2019, downloaded various

6    files from an IP address that you came to believe was

7    associated with Mr. Beler, correct?

8    A.  Yes.

9    Q.  Were you that undercover employee?

10   A.  Yes.

11   Q.  All right.  And did you have any communications or

12   conversations with anyone from Mr. Beler's address when you

13   were acting as that undercover employee?

14   A.  No.

15   Q.  Did -- how -- I guess -- how were you able to first make

16   contact with Mr. Beler's IP address?

17   A.  The program that we use, it searches out IPs that are

18   sharing known images of child pornography within a certain

19   geographical location.  And so it connected to the IP

20   address that was initially -- or that was subsequently found

21   to be assigned to Mr. Beler; so it was just someone that was

22   sharing known or suspected images of child pornography.

23   Q.  Okay.  And how did you first -- so you identified the IP

24   address that way.  How were you able to actually access

25   material that you believed to be associated with that IP

1    address?

2    A.  Based on a law enforcement tool; it connects to the IP

3    address that's sharing it and downloads files that it has

4    available.

5    Q.  Okay.  All right.  What evidence did you have prior to

6    the execution of the warrant that Mr. Beler or anyone using

7    that IP address was aware that they were sharing those files

8    with anybody else?

9    A.  None other than they were making them available to

10   share, so I was able to download them; just the general

11   peer-to-peer software.

12   Q.  Okay.  All right.  And was there any evidence that you

13   obtained during the execution of the warrant that Mr. Beler

14   was aware that he was sharing the files with anybody else?

15   A.  Not specifically.

16   Q.  All right.  What about after the execution of the

17   warrant; is there any evidence that you obtained that showed

18   that Mr. Beler was aware that he was sharing the files with

19   anyone else?

20   A.  Not yet.  We haven't completed the forensic review at

21   this point.

22   Q.  Okay.  Is it possible, in your experience, for a person

23   to be engaging in a peer-to-peer sharing and be -- have

24   files from their computer uploaded into that peer to peer

25   without being aware that those files are being uploaded?

1    A.  Depending on their knowledge of how the peer-to-peer

2    program works.  It automatically shares unless -- I --

3    depending on the type of software it has, it cannot

4    automatically share unless it's turned off; so it just

5    depends on the type of software that they have or the

6    version of the software that they're using.

7    Q.  Okay.  During the entirety of the execution of the

8    warrant, Mr. Beler is sitting in a chair within the

9    apartment --

10   A.  Yes.

11   Q.  -- while you all were talking to him?

12                  Okay.  I would like to mark as Defendant's

13   Exhibit 1 --

14                  MS. VOSHELL:  Your Honor, if I may approach,

15   please.

16                  THE COURT:  Of course.

17   BY MS. VOSHELL:

18   Q.  Furnishing you with what's been marked as Defendant's

19   Exhibit's 1, would you please identify --

20                  THE COURT:  May I asked whether you shared the

21   exhibit with Mr. Miranda?

22                  MS. VOSHELL:  I received the exhibit from

23   Mr. Miranda; and I just showed it to him before I

24   approached --

25                  THE COURT:  Very well.  Thank you.

1      THE WITNESS:  Yes.  I -- (indiscernible).

2  BY MS. VOSHELL:

3  Q.  Okay.  And would you please describe what Defendant's

4  Exhibit 1 is.

5  A.  It is the hallway that leads into Mr. Beler's bedroom;

6  and it has Mr. Beler sitting in the chair that he was in for

7  most of the search warrant.

8      MS. VOSHELL:  Okay.  I would like to introduce

9  Defendant's Exhibit No. 1, Your Honor.

10      THE COURT:  Is the admission of the exhibit

11  without objection, Mr. Miranda?

12      MR. MIRANDA:  Yes, Your Honor.

13      THE COURT:  Defendant's Exhibit 1 will be admitted

14  without objection.

15      (Whereupon, Defendant's Exhibit 1 admitted.)

16      MS. VOSHELL:  I have no further questions, Your

17  Honor.

18      THE COURT:  Thank you, Miss Voshell.

19      Do you have redirect, Mr. Miranda?

20      MR. MIRANDA:  No, Your Honor.

21      THE COURT:  Very well.

22      Thank you very much, Agent Griffith.  You may step

23  down.

24      THE WITNESS:  Thank you, Your Honor.

25      THE COURT:  Thank you.

1                Does the United States have other evidence?

2                MR. MIRANDA:  No, Your Honor.

3                THE COURT:  And do you, Miss Voshell?

4                MS. VOSHELL:  No, Your Honor.

5                THE COURT:  Do -- excuse me.

6                Do the parties wish argument; or do you submit,

7  Miss Voshell?

8                MS. VOSHELL:  No, Your Honor.

9                THE COURT:  Thank you very much, Miss Voshell.

10               The Court finds probable cause.

11               I realize we may have answered -- I may have

12  answered incorrectly when the deputy clerk asked were we

13  proceeding with a preliminary hearing only or also a

14  detention hearing.

15               The record does reflect that, at the time of

16  Mr. Beler's initial appearance, the Government did move for

17  a detention hearing --

18               MS. VOSHELL:  Yes.

19               THE COURT:  -- and we have not yet addressed it.

20  So I believe that we should proceed with the detention

21  hearing at this time as well.

22               Am I correct in my impression that the Government

23  intends to rely on the testimony of Special Agent Griffith?

24               MR. MIRANDA:  Your Honor, yes.

25               The Government is -- does intend to solely rely on

1    the testimony of Special Agent Griffith.

2         The Government is also continuing to persist in

3    its request for a hold pursuant to 3142(f)(1)(A).  As this

4    is a qualifying crime of violence --

5         THE COURT:  Very well.

6         MR. MIRANDA:  -- the presumption does apply.

7         However, Your Honor, with that being said, in the

8    immediate term, the Government is also concurring with the

9    recommendation for a 60-day inpatient -- as we discussed

10   yesterday, Your Honor -- for a 60-day inpatient evaluation

11   of the defendant based on the report that Your Honor

12   received.

13        MS. VOSHELL:  Yes.  And, Your Honor, we have

14   discussed this --

15        THE COURT:  I can hear you, Miss Voshell; but let

16   me ask you to come to the podium.

17        MS. VOSHELL:  Yes, Your Honor.

18        We discussed this matter with the Government

19   yesterday, and again today, and have agreed to jointly

20   continue the detention hearing in light of the report from

21   the forensic examiner, and the recommendation and the joint

22   agreement by both the Government and the defense that

23   Mr. Beler be transported to a facility for further

24   evaluation and treatment.

25        THE COURT:  I see no reason why the parties cannot

1    request a continuance of the detention hearing until that

2    time.

3            Are you in agreement, the two of you, that by

4    doing so you will not -- you agree to forego any argument

5    with respect to Speedy Trial Act implications of a motion

6    being under advisement?

7            I do not believe that is a correct reading of the

8    Speedy Trial Act; but the argument has been made in the

9    past.  And I simply want to know what your contention is,

10   Miss Voshell.

11           MS. VOSHELL:  Yes, Your Honor.

12           We don't see the speedy trial -- we don't see

13   there being issues with speedy trial.

14           THE COURT:  Very well.  Thank you very much.

15           And you, Mr. Miranda?

16           MR. MIRANDA:  Yes, Your Honor.

17           THE COURT:  Thank you.

18           The record will reflect then that we completed the

19   preliminary hearing; the Court made a finding of probable

20   cause, and that the parties jointly move to continue the

21   detention hearing until after such time that the evaluation

22   has been completed.

23           The Court will file the order providing for the

24   evaluation.  I believe it is appropriate for us to schedule

25   a status hearing date.

1          The order -- the order that the Court has

2     preliminarily drafted provides for an evaluation of 30 days;

3     although, we should all take this moment to look at the

4     statute.

5          So what is the parties' request regarding the

6     duration of the competency examination?

7          Miss Voshell.

8          MS. VOSHELL:  Your Honor, I believe we had

9     discussed 60 days yesterday.  If that's fine with the Court,

10    we would be fine with that.

11         THE COURT:  Very well.  Thank you.

12         Mr. Miranda.

13         MR. MIRANDA:  Yes, Your Honor.

14         I have no objection.  I was just -- I admit that I

15    have limited experience in how long these matters take; and

16    so I was just attempting to consult with pretrial to try to

17    get a sense of how long this would take.

18         We have no objection to 60 days, of course.

19         Our primary goal is to make sure that by the time

20    we come back the competency evaluation has been completed.

21         THE COURT:  The Court will proceed as follows.

22    The order that I enter -- consistent with orders that I have

23    entered recently -- will be for an evaluation of 30 days.

24         If the institution believes that additional time

25    is required, we will receive a written notice to that effect

1   and a request for an additional period.

2              Given the periods of delay that have manifest

3   themselves recently, with respect to transportation to and

4   from a point of study, I will suggest that we schedule the

5   status hearing for a date in June; although, I would

6   appreciate it, Mr. Miranda, if you would periodically update

7   Miss Voshell regarding information which you may be able to

8   access that she cannot from the marshal service regarding

9   transportation arrangements.

10             MR. MIRANDA:  Yes, Your Honor.

11             THE COURT:  Thank you very much.

12             Counsel, would you look at your calendars, please,

13  for an available date during the second or third week of

14  June, please?

15             I will suggest 10:30 a.m. on a Tuesday or Thursday

16  or 3 p.m. any afternoon, so as to avoid interfering with the

17  calendar of the duty judge who will be assigned in June.

18             MS. VOSHELL:  I think 10:30 on June 18th is

19  available.

20             THE COURT:  June -- what date?  I'm sorry.

21             MS. VOSHELL:  On June 18.

22             THE COURT:  Very well.  Tuesday, June 18th at

23  10:30 a.m.  That will be in this courtroom.

24             Very well.  Thank you very much.

25             Is there anything further with respect to this

1    matter at this time, Miss Voshell?

2            MS. VOSHELL:  No, Your Honor.

3            THE COURT:  Mr. Miranda?

4            MR. MIRANDA:  Not from the Government.

5            THE COURT:  Very well.  Thank you very much.

6            Mr. Beler, please return with the marshal, sir.

7            Counsel, you may be excused.

8            MR. MIRANDA:  Thank you, Your Honor.

9            THE COURT:  Thank you so much.

10            (Whereupon, the proceeding concludes, 3:28 p.m.)

11                    * * * * *

12                       INDEX

13

     WITNESS                        PAGE
14
     Tanya Griffith                 4, 8
15
     Defendant's Exhibit 1          18
16

17                    * * * * *

18                    CERTIFICATE

19            I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby
     certify that the foregoing constitutes a true and accurate
20    transcript of the FTR Gold software proceedings, and is a
     full, true, and complete transcript of the proceedings
21    transcribed to the best of my ability.

22
            Dated this 30th day of April, 2020.
23

24            /s/ Elizabeth Saint-Loth, RPR, FCRR
              Official Court Reporter
25